## ASAHEL H. HAVILAND *v.* JOHN P. HAYES.

*Insanity—Findings of jury—Province of Court.*

On the question of insanity, the judgment of a jury, when guided by the ability and discretion of an enlightened Judge, should not be lightly reversed.

When a decent, quiet, orderly man, meeting with losses of supposed importance to his position in society, abandons his business, secretes himself from observation, complains of his head, becomes noisy, obscene, and profane, shouts, sings, and prays, and finally becomes confessedly insane and dies a lunatic, the verdict of a jury, finding him insane from an early period after such losses occur, should not be disturbed for doubtful reasons.

This is an action to set aside a deed executed by Park Haviland and his wife to Albert Haviland, dated June 14, 1848, and also a confirmatory deed executed by Park Haviland to the Defendant on the 13th day of December, 1851. The ground of the action is the alleged insanity of Park Haviland at the time of executing the deeds referred to.

Albert Haviland died in April, 1855; and while the owner of the property conveyed, had executed a mortgage upon the same, under which a sale was had, and the Defendant became the purchaser in December, 1851. Park Haviland died in June, 1856, and the Plaintiff, as one of his heirs-at-law, commenced the present action. Issues were framed, by which various questions on the subject of the insanity of Park Haviland were presented. The issues were tried in June, 1860, and the jury answered the several questions in writing, and found that Park Haviland was insane and legally incapable of executing the deeds in question. At a Special Term held in the September following, the Judge who presided at the trial of the issues found and decided, as questions of fact, that the deeds were executed at the time alleged; that Park Haviland was insane at and prior to the execution of each of the deeds; adjudging that they be cancelled, and that the Plaintiff was entitled to recover one-fourth of the property described in the deeds.

A motion was made before the same Judge, by the Defendant,

for a new trial, which was denied, and judgment entered against him.

The Defendant appealed from this judgment to the General Term of the Second District, where the judgment was reversed upon the facts, as certified in the order of reversal, and a new trial ordered. The Plaintiff now appeals to this Court, stipulating that if said judgment is affirmed, judgment absolute may be ordered against him.

*H. A. Nelson* for the Appellant.

*A. J. Parker* for the Respondent.

HUNT, J.—In border cases it may be difficult to say what is sanity and what is insanity.

A distinguished writer says: "No one can say when twilight ends or begins, but there is ample distinction between day and night."

Between sanity and insanity there is ample distinction. It is not necessary to attempt a definition of insanity, nor to criticise that made by Lord Brougham, or Sir John Nicholl, or Doctor Ray, or to distinguish between the definitions given by numerous other eminent writers. The present is not a case of twilight, but one having ample distinction as to its character.

A course of action for a series of years, entirely different from that governing mankind at large, and different from his own former conduct and character—where the principles, feelings, emotions, and grounds of action differ entirely from that we all recognize as governing ourselves; where the individual, without motive, abandons the better and brighter parts of his nature, neglects civilization and refinement and comfort; where this difference is permanent and marked; where the change in his intellectual capacity, from that of an educated, careful, and attentive business man, is to one who is allowed no money except a trifle, like that which will please a child—whose property and person are entirely under the control of others, brutally exercised, and uncomplainingly submitted to; who requires the daily care of his wife to shave him; who at length becomes an inmate of a lunatic asylum, confessedly

insane, and who thenceforward lives and dies a lunatic—all these circumstances indicate a clear case of insanity.

Nice distinctions are here not required.

Prior to certain pecuniary losses, which occurred before 1827, it is proved that Park Haviland was a good business man, prudent, discreet, cheerful—a quiet member of the Society of Friends in his vicinity—ordinarily liberal, and in no way distinguished in his conduct from the most of his neighbors.

Numerous witnesses were examined who testified that for many years prior to 1848, and commencing as early as 1827, they had heard him shouting, praying, and cursing, so that he could be heard at a distance of a mile; they testified to his hiding himself from observation for many years; to his sitting in the hogpen for hours, when occupied by the hogs; to his sullenness and stupidity at his house; that he complained of pain in his head, and that all the business was transacted by his wife and his son.

If these were isolated transactions, not parts of his permanent character, I should not place much reliance upon them, as I do not upon the isolated instances of self-control or good conduct to which I shall hereafter refer. They seem, however, to have been his general characteristics for many years. His old acquaintances who had known him for forty years, his friends in the church, his relatives, all concur in this general estimate of his character and in their description of his conduct, and in the change in his character which then took place. The persons best qualified to speak upon this subject were those who had that opportunity of constant observation which a residence in the same family would give, who could see him at the table, in the family circle, and who knew his habits during a period of years in all the relations of life. It is to the wife, the children, and the domestics of the family that we should naturally look for the fullest information; and, in fact, their testimony is quite satisfactory to me, confirmed as it is by so many other witnesses in the case.

The wife testifies that she was married to Park Haviland in 1827; that after her son Albert was eighteen years of age, she and Albert managed the farm until 1850; that prior to this it was

managed by his other sons, George and Asahel; that her husband did no business, except to do an errand, as a child, when requested; he took no interest in the business, and did no work. As early as the birth of her son Albert, in 1827 or 1828, and on that occasion, without any family difficulty, he went away and was absent for three or four days. He was absent again from September until March, leaving his wife and her infant child at home, with a son by a former wife, and without cause or occasion.

In describing his condition at a later period, this witness says: "From 1845 to 1849 my son exercised control over his father; he would take hold of him and tell him to do so and so; he would shake him at times, and tell him to hush up; he would have raving times, and chase people with an axe; he used indecent language to people travelling on the road; when struck or taken hold of he would obey—the same before giving the deed and the same afterward."

It was only her consent, as it appears from her testimony, that was necessary to the execution of the deed, and when that was obtained, and at her request and Albert's,. the father, without inquiry or remonstrance, executed the deed. It was the wife, and not the father, who required the agreement for support to be previously made; and when made to her satisfaction, the affair was completed. On his return under her charge from the execution of this deed, he got out of the wagon, and upon the idea of fixing the harness, so unbuckled it that, on starting, the horse walked out of his harness and away from the wagon. The wife then got out, rearranged the harness, and drove him home, he sitting quietly in the wagon. She says that after the birth of Albert her husband had no money, except that sometimes the boys would give him a few shillings to please him. Sometimes he would hollo and scream night and day, and at all times; at other times he would be quiet. "I tried to keep these things from the world." Such would be the promptings both of delicacy and affection. In 1847 Park's eldest daughter came home and remained until the fall of 1848. Mrs. Haviland says that her husband was cross to her and thought she was not his daughter, but some of the

Toffey folks. She shaved him during all this period, because she was afraid to trust him with a razor. He was once found away from home, in an out-building, with a rope. On her cross-examination she states she lived in the house with him before her marriage; that he was then noisy at times, but after his loss of property the disease grew upon him; he would swear and be noisy, without provocation; that there was but little conversation, except her efforts to keep him calm.

The hired man, Warren Wooden, was called by the Defendant, and testified to some transactions of business by Park Haviland, between April, 1850, and June, 1851, the period of his residence in the family. On his cross-examination, after stating certain matters hardly fit to be discussed, he says that " when excited he was very profane; the sight of Craft would excite him; he said he was going to have him in State prison. He never saw Craft pass without getting in a rage (this animosity was without cause); he chased a black man with an axe. She (Mary Jane Cronk) threw a pail of water on him one day, and then struck him with the pail. Mary Jane and he had a fight one day. Each had a weapon.

" He was swearing at the table, and Albert threw a vinegar cruet at him. I saw Albert take him by the collar and throw him down, and order him in the house. I thought from the noise Albert was whipping him. He holloed, ' Oh! oh dear,' a great many times. A man came there by the name of Halley. Albert ordered Park into the house. He went in, and after a while came out, and said the prisoner had got loose. Albert had tied him up. Albert went in with him again, and came out without him. Park was the largest—a large, strong man; he ordered him to shut up; said, ' Shut up your d—d old head;' he did not obey; Albert tried to slap him, and he could not, and left without his breakfast. I saw Albert jerk him on the floor; he got up and went to George's, as he said, and George said it was good enough for him. . . . I have heard him at night, after he had gone to bed, talk about the black man; he kept me awake; he said the black man had stolen a crow-bar."

Mary J. Rider testified that she lived in the family of Park Haviland from 1842 to 1848. She says: " I did observe the acts and conduct of Park Haviland, while I resided there; he acted very boisterously; cursed and swore and holloed night and day; he would go into the fields and sit for hours at a time; he would wring his hands a great deal; he chased me several times with an axe; he would frequently wish thunder and lightning would strike the family; he would talk obscene language, let who would be present. These acts took place almost all the while, particularly the last year of my staying there. There were a great many of his acts which I cannot describe."

In answer to another inquiry, she said that " Albert was very cross and ugly to his father for a year or more before I came away. Would often strike his father—sometimes two or three times a day, when he got angry at him. I have seen Albert jerk him around and kick him. This was quite frequent during the last year I lived there. Albert could make him mind whenever he wanted to. . . . Albert used to threaten to whip his father if he did not give him a deed. . . . When they were in the house together, Albert was continually coaxing and threatening him for a deed; saw Albert get angry with his father, because he did not want to give him a deed, several times, and then he would strike him and jerk him around the room, and sometimes down on the floor. This conduct was frequent in the spring of 1848, and continued as long as I lived there."

We have no evidence that can be relied upon as to his physical health when the change in his character first occurred, except his complaints of pain in his head.

If it had appeared that at the same time his bodily health was seriously affected, that he lost his strength, that his vital energy failed, I think there would have been the strongest reason for believing that a disease of the brain was the seat of the difficulty. It would be no objection to this theory that he should subsequently have become large and fleshy, as this bodily condition is of common occurrence among those whose brain is seriously diseased.

The case was fully and fairly tried. The charge to the jury

was not only correct, but it was wise and discriminating. They pronounced it to be a case of insanity.

I place great reliance upon the verdict of a jury thus guided and directed; more than upon the opinion of the Judges at a General Term, however learned they may be.

To show his mental capacity, it was proved by a stage-driver that the deceased grantor, about the date of the deed, was in the habit of sending notes by him for discount at the bank, and receiving the proceeds in return. Stage-drivers embrace all degrees of character, from the careful and worthy proprietor to the worthless vagabond.

It was for the jury to designate the position of this individual. The proof is most abundant that at this time, as well as for years before and after, he was the mere instrument of his son, submitting to his orders and obeying his wishes; that all the business of the farm and family were done by his wife and son, with the exercise of no judgment or authority on his part. I do not feel at liberty to disregard the opinion of the jury on this branch of the case.

It was proved also that the deceased grantor applied to a Justice of the peace to draw the deed to his son, and to Mr. Aiken to draw a bond for the support of himself and wife, and that his conversation was reasonable, and his conduct free from exception on those occasions.

It was proved also that he executed the quit-claim deed to Mr. Hayes, in the presence of a number of witnesses, and acted as a man of ordinary intelligence would have done.

This was testimony eminently for the consideration of the jury. They may have credited the statements partly, or they may have taken them with qualifications.

I can easily conceive how the jury may have believed them, substantially, and yet have reached the conclusion they did reach.

In the first place, the actor was well prepared for the occasion, and impressed with the necessity of careful deportment.

He was well dressed and carefully shaved by that faithful wife who had performed that duty for him during a period of twenty-seven weary years. He was probably well prepared by his son,

as well by instruction as by persuasion, or by that rougher treatment of which the case contains so much painful evidence. The wife describes the preparation for the transaction, and the almost automatic manner in which Park performed his share in it. She says that Albert asked her when she and his father were going to execute the deed. She said not until he executed the bond. The same day the bond was executed and given to her, and she then consented to execute the deed.

She proceeds: "I said to Park, we will go down to Wesley Stark's and have the deed executed. He made no reply. I fixed him, shaved him myself—as I had done for twenty years—got him ready, and said, 'Park, we will go.'

"I put the deed in my pocket. Albert said to me, 'Take some money and pay Stark for executing the deed.' Park did not resist or make any reply. He got into the wagon. I drove three miles to Stark's. Nothing was said on the road about the business. When I drove up to Stark's I said: 'Here is a gentleman who desires to do a little business with you.' He asked who it was. I said, 'Park Haviland.' He said, 'What does he want done?' I handed him the deed. He said, 'Do you do this with your own free will?' Park did not appear to take any notice of it. I looked up to him and nodded my head, and Stark went on writing. . . . Stark said, 'You may come now and put your name to it.' I handed him my glasses, and he went and put his name down. I also signed it. He had no glasses of his own; he always used mine. The deed was not read to him, or by him, in my presence. When Stark said the deed was done, I took it and put it in my pocket and gave it to my son. No one was present when I gave it to him. I don't know that Park knew of the giving of the deed to Albert."

That Mr. Hayes had arranged the scene in which he was a party is reasonably apparent from his assembling so many persons to witness the transaction, and his previous request to one of them to put certain questions to Haviland, which the witness failing to do, Mr. Hayes himself put the questions, and received the desired answers.

In the next place, it is well to consider here that the insane man is not in the same condition at all times. A man may be certainly insane, although he be not a raving maniac or an absolute imbecile. Nor is it necessary that a delusion which possesses him should at all times operate with the same force; or that his self-control should at all times be entirely lost. The benevolent institutions to which this class of unfortunates are now committed endeavor to stimulate their self-control by rewards or deprivations. The permission to work in the fields or the garden, to go to the post-office, to sell their productions, to drive with the better class of patients, to discharge any duty, or to fulfil any trust or confidence, are held out as rewards for good conduct and self-control.

These motives produce the most striking results, and show that the power of controlling their conduct and conversation is much more within the possession of the patients than is generally supposed. Nevertheless, such parties are undoubtedly insane. If a person has so little or such perverted intellect that he is unable to comprehend the subject before him in its relation to himself, the party with whom he is dealing, and others who have claims upon his justice or his bounty, his contract ought not to be sustained. He may be able to restrain his violence for the moment, and to converse with discretion and judgment for a brief period; there may be remissions or mitigations of his disease, and yet he be insane.

The two physicians, who had been long connected with lunatic asylums, gave it as their judgment that such was the case with Park Haviland.

On the question of " compos mentis " simply, and irrespective of the measure or extent of capacity, I concur with the jury that he was not " compos mentis," and that the deed was obtained by undue influence.

I have great confidence in the good-sense and judgment of a jury as applied to such cases; and when guided by the ability and discretion of an enlightened Judge, I think their verdict should not be lightly reversed.

A decent, quiet, sober, orderly man meets with losses, important, as he supposes, to his position in life. From this time he abandons his business, soon secretes himself from observation, complains of his head; at length becomes noisy, obscene, and profane; shouts, sings, and prays so that he can be heard at the distance of half-a-mile.

From month to month, and year to year, he becomes more and more changed in his character; becomes subject to fits. He was found sitting for hours in the hogpen among the swine; he refuses to be consulted about anything; his wife and his son transact all his business; he has no money, except a few shillings given to please him; he does nothing except a few errands, as a boy; his son horsewhips him, ties him with cords, and throws him upon the ground, to which the father, the larger and stronger than the son, submits uncomplainingly; he has no spectacles of his own; he is shaved by his wife for a period of twenty-seven years; he attempts to commit suicide; he quarrels with the servant-girls on the most trifling pretences; follows them with an axe; he gives a deed of his farm at the simple direction of his wife, without remonstrance or inquiry; and in three years thereafter is placed in a lunatic asylum as confessedly insane, and dies an undoubted lunatic. I concur entirely in the finding of the jury that Haviland was insane at the time of the execution of the deed to his son, and at the time of the execution of the deed to Mr. Hayes. The judgment of the General Term must be reversed, and that of the Special Term affirmed.

Concurring: PORTER, GROVER, DAVIES, and BOCKES, JJ.

FULLERTON, J. (dissenting).—The objection that the questions of fact involved in this case were not open to review in this Court was not well taken. Notwithstanding that issues were framed and tried by a jury, yet for all the purposes of a review it is to be regarded as a trial by the Court, and as falling within § 268 of the Code. The judgment in such a case is not entered upon the answers of the jury to the questions put to them, but upon the findings of the Court, and the judgment is directed by the Court.

Whether, therefore, upon the whole case, the judgment ordered was correct, is open for consideration here.

The burden of proof in this case was with the party seeking to invalidate the deeds. It lay with him to show, beyond any reasonable doubt, that Park Haviland was insane, or so far deranged in mind as to be incapable of transacting business, when the deed dated June 14, 1858, was executed, or, if of sound mind, that the deed was procured by force, fraud, or undue influence. In this, I think, he has failed.

It is undeniable that the grantor, at times, for some years prior to the date of the deed mentioned, exhibited many striking symptoms of insanity. But this was not his condition at all times. Some of the witnesses speak of the change in his mental condition taking place as early as 1816, when he met with some pecuniary losses.

On the trial of the cause, his conduct and condition, from that early period to the time of his death, were the subject of examination, and the following facts were established: His bodily health was for most of the time good, although at a very early period he complained of his head, and continued to do so at times during the remainder of his life.

He avoided the society of his fellow-men, and was in the habit of hiding himself in unusual and unseemly places. He remained silent when spoken to, and turned abruptly away from those who addressed him. He attached undue importance to losses, and indulged in vague and unwarrantable fears of bankruptcy, and consequent want.

He talked, when alone, in a loud and boisterous manner, and mingled with his prayers impious imprecations. He was extravagant and incoherent in his language, violent in gesticulation, and moved to great excitement by inadequate causes.

He was negligent in his dress, and, on some occasions, obscene in his language.

When excited, his face became unnaturally flushed, the veins of his temples much enlarged, and his eyes assumed an unnatural wildness.

In enumerating what are claimed to be evidences of his insanity, we fail to find any disposition to *undervalue, waste,* or to *destroy* his property. Down to the date of the first deed, he seems to have made no improvident bargains, and to have taken ordinary care of what he possessed.

During this period he worked more or less on the farm. He mowed, cradled, stacked hay, and did the most, if not all, of the churning for the dairy. He made notes for large amounts, some of which he procured to be discounted, received and counted the proceeds, and sent them West to his son Albert to purchase cattle for the farm.

In his son's absence, he delivered some sheep that had been sold, and selected from a flock the particular ones the purchaser was entitled to under his contract. He consulted his physician as to his bodily diseases, stated the symptoms. correctly and with precision, inquired intelligently as to the effect which was claimed for the remedies prescribed, and afterward informed the Doctor that he had experienced relief. This was in 1851, about three years subsequent to the execution of the first deed; and the family physician, in his testimony, says of him at that time : "I discovered nothing irrational—not the slightest aberration of mind. I think he was a sane man."

He applied to one of his neighbors to draw the deed conveying the farm to Albert ; said he was going to give his son a deed of his farm, and wanted a bond back for the maintenance of himself and wife during their lives. He afterward brought an old deed, from which the scrivener obtained the boundaries of the land to be conveyed, and designated which of the two pieces of land set out in the old deed he wished to convey. He took the deed, when drawn, to the proper officer to have it acknowledged, and gave prompt and pertinent answers to the questions put to him during the ceremony of acknowledgment.

It seems satisfactorily established, therefore, that the deed was drawn at his request, executed and acknowledged voluntarily, and apparently with a full understanding, on his part, of its contents. During the time all this business was being done his mind

appeared to be calm ; he manifested none of the excesses of speech or manner which at times he had exhibited, and to all appearances was effectuating his own will in his own time and way.

He spoke of the deed after it was given, and explained why he had given Albert so much of his property. He alluded to the trouble that he and his wife might be to him, and remarked in that connection that he would have no more than his share.

I have not overlooked the medical testimony bearing upon the question of insanity. This testimony is quite unsatisfactory. Doctor Hoag saw him but once, in 1849, and the meeting was accidental, and not with a view to determine his condition. He had been in practice but five months, and laid no claim to skill or experience in mental diseases.

He gave no decided opinion.

Doctor Barnum saw him in 1851 or 1852, three years after the execution of the first deed ; made an examination of him, with a view of testing his sanity, lasting " a very few minutes," and pronounced him insane. Dr. Cook saw him at the Lunatic Asylum at Utica in 1853, and he testified : " His mind was much impaired from long-continued mental disease. . . . He was incurable. The prominent symptoms were chronic mania." But he also frankly said that, from what he saw of Park Haviland, he could not tell that his disease existed for more than two years before he saw him.

On the other hand, Doctor Northrop, who was the family physician until 1852, and who made professional calls in 1847-8-9, testifies : " Mrs. Haviland was sick. I called occasionally. When I saw Park he appeared rational. He inquired about the disease and mode of treatment, and took a good deal of interest. In dangerous cases, he was always present. In trivial cases he was retiring. I prescribed for him in 1851. He came to my house on horseback, and related symptoms of urinary difficulty. I was satisfied of the difficulty, and made prescriptions. He said he had difficulty of voiding water. I prescribed burdock leaves. He inquired as to the effect of the medicine. He afterward said the medicine had operated as I described . . . He said his diffi-

culty was overcome and he was relieved. I discovered nothing irrational, not the slightest aberration of mind. I think he was a sane man." Whether this was before or after the date of the deed is left in doubt; but at all events it shows that there were times, other than when the deed was executed, when Park Haviland was calm, self-possessed, and, so far as any judgment could be formed from conversation and outward appearance, in the full possession of unimpaired faculties. The causes which produced the condition in which Doctor Cook found him at the asylum were doubtless then at work; but that they, at that time, had destroyed his capacity for business, is not satisfactorily established. Mental, like bodily disease, is progressive; and to determine at what particular stage of it the mind loses its balance, and becomes in law unsound, requires, at times, minute personal observation, aided by the highest human skill. Little confidence, therefore, in my judgment, should be placed on the opinions of physicians on the subject of insanity, who have not devoted themselves to its study. And even then, at times, a diseased mind baffles the skill of the wisest.

There is probably no department of scientific investigation where observation and experience are of so much value, and where mere opinions, in cases not well defined, are so unsatisfactory. Mental disease manifests itself in multifarious forms. It may have its germ in what are supposed to be eccentricities of character, or constitutional idiosyncrasies, which, though harmless for years, in the end may destroy the reason.

There is no infallible standard by which sanity can be judged. The extremes of mental condition are easily distinguished. The sane man is not confounded with the drivelling idiot or the raging madman. But to determine where sanity ends, and madness begins, in a case like the one before us, is a problem of difficult solution. Little aid, therefore, is afforded by a physician who had been engaged in the practice of his profession but five months, or one who saw him but twice with a view of testing his soundness of mind, and even then but for a very brief period.

Doctor Cook's judgment is entitled to great weight, but he saw

him for the first time in 1853, when he had passed into a hopeless state of insanity. What else he knew of him, was what he learned from the witnesses on the trial; and his opinion, therefore, was not founded altogether on his own personal observation. To adopt an opinion formed under such unfavorable circumstances, and on the strength of it hold, in the face of all the testimony affirming his soundness of mind, that Haviland was incapable of disposing of his own property, would be adopting a hazardous rule. I am therefore of the opinion that the testimony will not sustain the finding that Park Haviland was insane on the 14th day of June, 1848, when the deed to his son Albert was executed.

It is not without its effect upon the mind, in considering the question of insanity, that no steps were taken by the Plaintiff, or other member of the family, to have Park Haviland declared a lunatic, and prevent him from squandering his property, if he were considered at the time to be of unsound mind. When the first deed was executed the Plaintiff was more than thirty years of age, and other members of the family were still older. Albert had spoken openly of his intention to get a deed, and there was nothing secret or concealed in the manner of its execution. It seems to have been known generally in the neighborhood soon after its execution, and public rumor questioned the title long before the sale under the mortgage, whereby the Defendant acquired his title. The inference is irresistible that the Plaintiff knew that his father had conveyed the property, and it would seem unaccountable that no steps were taken to have him declared of unsound mind, if he supposed sufficient reasons existed therefor.

Neither is there satisfactory evidence in the case that the sale was forbidden. Some paper was handed to the referee, which he did not read at the time. It is not made a part of the case; and whatever it was, it was not made public at the time, and one of the sons of Park Haviland bid $3,500 on the property.

This sale was consummated by the delivery of the referee's deed early in 1852, and the purchaser entered into possession. These facts furnish some evidence of the estimate which the family put upon his capacity to dispose of his property, and suggest

the manifest propriety of requiring of the Plaintiff, before he can set aside the conveyances at this late day, the most satisfactory evidence of his father's insanity when the conveyance was made.

The learned Justice who tried the case did not find that the deed was obtained by fraud or undue influence, and it is therefore unnecessary to consider that question.

The judgment of the General Term should be affirmed; but considering the nature of the case, it should be without costs.

Reversed.

JOEL TIFFANY,<br>State Reporter.